UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JARED GRAVES, | ) |
|     Plaintiff, | ) |
| v. | ) Case No. 18-CV-416-JED-CDL |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | ) |
|     Defendant. | ) |

**OPINION AND ORDER**

This insurance dispute comes before the Court on the Motion for Summary Judgment (Doc. 93) of Defendant Travelers Property Casualty Company of America.

### I.  Background

During the period relevant to this litigation, Mr. Graves worked for Hahn Appliance Center Inc. as the junior member of a two-man delivery crew. On September 6, 2017, Graves's work partner caused a roll-over wreck while driving their delivery truck. The truck was totaled, and Mr. Graves suffered serious injuries, including serious brain trauma.

At the time, Hahn insured its truck fleet through a commercial insurance contract with Travelers. When Graves tried to open an uninsured motorist (UM) claim, Travelers said the vehicle was not covered under Hahn's UM policy. Later, after Mr. Graves persisted, Travelers reversed course and agreed to pay $850,000 on his policy-limits claim of $1 million. Shortly thereafter, the company acquiesced and agreed to pay his claim in full.

In his petition, originally filed in state court, Graves alleges breach of contract and bad faith,[1] claiming that Travelers' initial denial of coverage and subsequent decision to pay less than the claimed amount was an intentional attempt to avoid its contractual obligations. At the very least, he claims, its decisions were the result of a grossly negligent investigation of his claim. Travelers now seeks summary judgment on both of Graves's claims.

A.  The Policy's Terms

Hahn acquired its policy with Travelers through insurance broker HUB International, according to Volha Mironava, a Hahn employee who handled insurance claims for the company. Periodically, when Hahn's existing policy was set to expire, the company would provide HUB with information about its vehicle fleet so HUB could solicit bids from insurers. (Doc. 100-5 at 2–3, 4). Hahn selected Travelers for the 2017 coverage year and negotiated a comprehensive policy through underwriter Nick Burke. (Doc. 100-5 at 6, 11, 13, 14).

Under the policy, whether a particular claim was covered depended on whether the vehicle in question qualified as a "covered auto" for the relevant type of coverage.[2] The policy Declarations page, a portion of which is pictured below, indicated which vehicles were "covered autos" by placing one or more number designations ("covered auto symbols") next to each coverage type. The contract's Business Auto Coverage Form in turn defined what vehicles were included under each number symbol. Notably for the purposes of this litigation, the Declarations

---

1. Although breach of contract and bad faith are distinct causes of action, Graves's petition styles them as one. For the sake of clarity, and because Travelers' motion offers differing arguments on each claim, the Court analyses them separately in this opinion.
2. The policy's uninsured-motorist endorsement provides that Travelers "will pay, in accordance with Title 36, Oklahoma Statutes, all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or driver of an 'uninsured motor vehicle.'" (Doc. 93-5 at 42, ¶ (A)). The endorsement defines "insured" to include anyone occupying a "covered auto" as defined under the policy. (*See id.* at 42, ¶ (B)(2)(a)).

page showed symbols "2" and "8" next to the physical-damage coverage, but only symbol "2" next to UM coverage.

```
ITEM TWO:
A. COVERAGE AND LIMITS OF INSURANCE:

    Coverage applies only to those "Autos" shown as Covered "Autos".
    "Autos" are shown as covered "autos" for the applicable coverages by the
    entry of one or more of the symbols from Section 1 - Covered Autos of
    the Business Auto Coverage Form next to the name of the coverage.

                              COVERED           LIMITS OF
    COVERAGE                  AUTO SYMBOL       INSURANCE

                                                The most we will pay for
                                                any one accident or loss.

    COVERED AUTOS LIABILITY     1               $ 1,000,000


    AUTO MEDICAL PAYMENTS       2               $ 2,000 EACH INSURED


    UNINSURED AND               2               SEE CA T0 30
    UNDERINSURED
    MOTORISTS COVERAGE

    PHYSICAL DAMAGE             2   8           Actual Cash Value or Cost
      Comprehensive Coverage                    of Repair, whichever is
                                                less, minus deductible
                                                shown in ITEM THREE-
                                                SCHEDULE OF COVERED AUTOS
                                                YOU OWN for each covered
                                                Auto.
                                                SEE ITEM FOUR FOR HIRED
                                                OR BORROWED "AUTOS".
                                                SEE IL T8 25
```

The Coverage Form defined symbols 2 and 8 as "owned autos" and "hired autos," respectively.[3] Thus, under the policy's standard terms, a physical-damage claim would be covered whether the vehicle was "owned" or "hired," but a UM claim was only covered if the vehicle was "owned."

The standard terms, however, were modified by a series of endorsements, one of which broadened the definition of which vehicles were "owned." The "Lessor—Additional Insured and Loss Payee" endorsement (Lessor Endorsement) provided that "[a]ny 'leased auto' . . . will be considered a covered 'auto' you own and not a covered 'auto' you hire or borrow." (Doc. 93-5 at

---

3. The Coverage Form further defined "owned autos," in relevant part, as "[o]nly those 'autos' you [the named insured] own." (Doc. 93-5 at 20). It defined "hired autos" as "[o]nly those 'autos' you lease, hire, rent or borrow." (*Id.*).

3

41). It further provided that "'[l]eased auto' means an 'auto' leased or rented to you . . . under a leasing or rental agreement that requires you to provide direct primary insurance for the lessor." (*Id.*). Thus, although the Declarations limited UM coverage to "owned autos," the Lessor Endorsement operated to extend UM coverage to certain leased vehicles by redefining them as "owned" for the purposes of the insurance policy.

**B.     Travelers' Handling of the claims**

The day after the accident, Hahn submitted a physical-damage claim for the ruined truck, which Hahn leased under an agreement with Penske Truck Leasing. A week later, September 14, 2017, Travelers sent an email to Ms. Mironava at Hahn asking that she provide the lease agreement between Hahn and Penske. (Doc. 93-8 at 2–3). Mironava responded the same day. "Attached is requested Penske Lease Agreement for the truck," she said. "Let me know if you need anything else." (Doc. 93-7).

The document she attached turned out not to be the actual lease agreement. Rather, as was her customary practice when making insurance claims, Ms. Mironava sent Travelers a copy of the "Certification of Lease," a one-page document whose stated purpose was "to certify that the Vehicular Equipment described below has been leased by Hahn Appliance Center . . . from Penske Truck Leasing Co." (Doc. 93-4 at 1). Included with the Certification were several other pages of material: a "Vehicle Delivery Receipt," a "non-contractual Lease Unit Detail," which showed maintenance charges incurred since Hahn took possession, a billing schedule, and a maintenance invoice. (*See* Doc. 93-4 at 2–7). None of the pages provided the terms of the lease itself.

Despite the mix-up, an adjuster acknowledged coverage the same day and began the process for determining the amount of compensation due. (Doc. 101 at 4–5). Later, during "management review," a supervisor agreed. "Coverage confirmed, long term lease, [coverage]

under symbol 2," he wrote in a November 15 note. (*Id.* at 11). "As per normal process with Penske, they will release veh[icle] to Travelers once payment is rec'd."

On December 22, 2017, Bret Untershuetz, Mr. Graves's counsel at the time, faxed a letter to Travelers asking the company to set up a UM claim,[4] and Travelers assigned the investigation to adjuster Adam Meyer. Although he was an experienced adjuster and licensed in Oklahoma, Meyer had only been handling commercial-fleet policies for a few months. (Doc. 100-1 at 3, 5). His investigation took less than 24 hours.

On January 2, 2018, Mr. Meyer began working on the file and entered the following note in the claim system: "UM cov[erage] for sym[bol] 2 – owned autos. [Insured vehicle] for loss is a leased/hired auto. No endorsements appear to apply to change the above. UM cov[erage] may not apply." (Doc. 101 at 14; Doc. 100-1 at 8). The next day he denied coverage. Asked how he reached this decision, Mr. Meyer testified that he denied coverage because the "lease agreement we had on file" did not include a primary-insurance clause, which was necessary for a leased vehicle to qualify as "owned" and therefore a "covered auto" for the purposes of UM coverage. (Doc. 100-1 at 7). Mr. Meyer said he could not remember if he tried to find out what coverages applied to the vehicle by searching Travelers' system for its VIN number or if he looked to see whether Hahn was paying UM premiums on it. (*Id.* at 10–11). Asked whom he consulted on the decision, he said that he discussed it with his manager, but he primarily sought out the advice of Travelers' coverage attorney because the truck "appeared to be just leased out. There was UM coverage on the policy,

---

4. There is some confusion in the record as to when Travelers first received a request seeking UM coverage. The letter submitted to the Court by Travelers was faxed on December 22, 2017, but Mr. Untershuetz appears to have faxed it to State Farm. (See Doc. 93-12; Doc. 93-13 at 12–13). Notes entered into the claims processing system show that Travelers received the request on December 28, 2017. (Doc. 101 at 12). In any case, Travelers does not dispute that it received a UM claim request from Mr. Untershuetz sometime in late December of 2017.

5

but it only applied to owned autos. And — so I — I thought I should talk about it with him." (*Id.* at 10).

On January 29, 2018, Mr. Meyer notified Mr. Untershuetz in writing that Travelers had disclaimed coverage of Mr. Graves's UM claim. "Please find attached the UM coverage disclaimer we are issuing to your client. In short, the vehicle Mr. Graves was in did not have Uninsured/Underinsured Motorist coverage available," Meyer said in the body of the email. (Doc. 101 at 15–17). The attached disclaimer letter was only slightly more specific:

> Please be advised that this policy provides Uninsured/Underinsured Motorist coverage to owned automobiles only. The 2017 Isuzu being operated in this loss was being leased from Penske Leasing and Rental. Since the 2017 Isuzu is not an owned automobile, there is no Uninsured/Underinsured Motorist coverage available under this policy.
> . . .
> The foregoing disclaimer is premised upon the terms and conditions of the policy. By limiting policy references to those cited, Travelers does not waive any other policy provisions. The insurance policy in its entirety is incorporated by reference as if it had been stated in full.

(Doc. 93-14). Neither the email nor the attached letter mentioned the Lessor Endorsement, that certain leased vehicles were "owned" for the purposes of the insurance policy, or that Travelers had concluded that the endorsement did not apply due to the lease document on file.

On January 31, 2018, Mr. Untershuetz emailed Mr. Meyer requesting a copy of the policy, the declarations, and endorsements. (Doc. 100-2 at 1). The same day, Mr. Meyer responded by email, saying:

> Bret,
>  We don't believe we are currently in a position to necessitate the release of our policy or endorsements since coverage has been disclaimed for your client. However, I have attached the declarations page for this policy. As you can see on the first page, UM/UIM coverage applies to "Symbol 2" vehicles. The second page describes "Symbol 2" vehicles as owned "autos" only. I now refer you back to the police report (which I assume you have a copy of) that shows Penske Leasing and Rental as the owner of the involved vehicle. Since this vehicle is not owned by our insured, it does not have UM/UIM coverage.

6

> Hopefully this information satisfies your curiosity on this matter. Please let me know if there is anything else you wish to discuss.

(Doc. 100-2 at 1). The Declarations page was redacted to obscure the policy's coverage limits and the autos included under other coverage types. Again, Mr. Meyer made no mention of the endorsement modifying the definition of "owned auto."

Shortly after this exchange, Mr. Untershuetz appears to have referred this case to attorneys Anthony Sutton and Marlin Davis, Mr. Graves's counsel of record in this matter. On February 23, 2018, Mr. Davis sent Mr. Meyer a sternly worded letter reiterating his predecessor's request for policy documents and expanded it to include information regarding Travelers' coverage of leased vehicles. (Doc. 93-16). Mr. Davis further stated that he viewed Travelers' refusal to provide Mr. Untershuetz with all of the requested information as bad-faith conduct and a violation of its duties under Oklahoma law. Continued failure to provide the requested information would result in legal action, he said. Mr. Meyer responded in a March 1 letter:

> We have received your letter of representation dated February 23, 2018 and are currently looking into your requests. More specifically, we are attempting to obtain the complete Penske lease agreement in order to further verify the owned/hired status of the truck involved in this loss. I will reach out to your office as soon as the agreement has been received and we've had a chance to determine if our prior determination was correct.

(Doc. 93-17). The email did not address the documents and information Mr. Davis had requested.

Mr. Meyer contacted Ms. Mironava at Hahn the same day. "We're taking a second look at the available coverage for this loss," he said. "We need the complete Penske Lease Agreement with the contract language. Previously, you provided us with the certificate and the schedule. Please get the contract to me as soon as possible." (Doc. 93-9). Ms. Mironava, in turn, sought a copy of the lease agreement from HUB and sent it to Meyer via email on March 12, 2018. (Doc. 93-18; Doc. 93-19). The next day, March 13, Mr. Meyer entered the following note into the system: "Complete [lease agreement] has been received. It confirms that the [named insured] was required

to maintain liability coverage on [insured vehicle]." (Doc. 101 at 20). Mr. Meyer also sent an email to Mr. Graves's counsel:

> As discussed, we've had a chance to take a second look at our coverage stance on this matter after obtaining the complete lease agreement for the involved vehicle in this loss. We've updated our opinion, and it appears Uninsured/Underinsured motorist coverage would apply to this matter. Hahn Appliance policy carries UM/UIM of $1,000,000 single limit. Given the candor of our conversation and updated coverage opinion, I imagine that your previous requests on this matter are satisfied. Please let me know if I am mistaken.

(Doc. 93-20). The email did not address the previous requests for a full and unredacted copy of the policy and the lease, even though Mr. Graves's counsel had reiterated the request as recently as the day before. (*See* Doc. 100-10 at 2).

On March 27, 2018, Graves's attorneys sent Travelers a letter that summarized his injuries and made a formal claim for the full $1 million available under the policy's UM coverage. (Doc. 93-21). Medical records and a signed medical authorization were attached. On March 29, Mr. Graves's counsel reiterated its request for information and documentation regarding the policy. (Doc. 93-22).

On April 5, 2018, a new Travelers adjuster—Mr. Meyer was reassigned—finally provided a full copy of the policy and of Hahn's lease agreement with Penske. The company also requested a new medical authorization, as it was unable to find the previously sent copy in its file. (Doc. 93-22). It is unclear whether Mr. Graves's counsel provided a new authorization or whether Travelers eventually found the authorization they had already submitted.[5] In any case, the company began

---

5. Travelers asserts that Mr. Graves's counsel provided an executed medical authorization on April 17, 2018, but this is not supported by the cited Exhibit. (*See* Doc. 93 at 13, citing Doc. 23). In the Exhibit, Mr. Sutton appears to reject Travelers' request that Mr. Graves execute its preferred medical authorization form. Instead, Mr. Sutton simply refers Travelers to the authorization his co-counsel sent on March 27, 2018. (*See* Doc. 93-23).

gathering information about Mr. Graves's injuries and medical expenses shortly thereafter in order to determine the value of his claim.

On May 15, 2018, Travelers issued a check for $850,000, payable to Mr. Graves, the law firm representing him, and Standard Fire Insurance Company (SFIC), Hahn's workers compensation carrier, which had been paying medical and income benefits to Graves and claimed the right to subrogation on Graves's UM benefits. (Doc. 93-24; Doc. 94-2). On July 10th, Travelers received information from SFIC related to future anticipated medical expenses that Mr. Graves could reasonably expect to incur. (Doc. 93-26; Doc. 93-27 at 2). SFIC estimated the future expenses at $481,399. A Travelers adjuster, in an internal email, complained that SFIC would not disclose the basis for its projection but nevertheless recommended Travelers revise its benefits award to the $1 million limit. Even if future expenses came in at half of SFIC's projection, that would be sufficient to exhaust the UM coverage limits, he said. (Doc. 93-26 at 2). On July 23, 2018, Travelers issued a check to Mr. Graves and his attorneys for the unexhausted portion of the available coverage, $150,000.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id.* at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id.* If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, all other factual issues concerning the claim become immaterial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Id.* at 323. If the movant carries this burden, the nonmovant must "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson,* 477 U.S. at 248; *Celotex,* 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998); Fed. R. Civ. P. 56(e)(2). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler,* 144 F.3d at 671. Although a district court has discretion to go beyond referenced portions of the supporting material, it is not required to do so. *Id.* at 672. The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52.

### III. Discussion

Travelers moves for summary judgment on both Mr. Graves's breach of contract claim and his bad faith claim. Travelers further argues that, even if either of these claims are allowed to move forward, it is entitled to summary judgment as to the availability of punitive damages.

**A.    Breach of Contract**

Travelers argues that it is entitled to summary judgment on Mr. Graves's breach of contract claim because he cannot show any damages. (*See* Doc. 93 at 20–22). Damages are a necessary element of a claim for breach contract, *Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001), and liability for breach of a UM insurance contract is limited to the amount of the UM policy coverage, *Watson v. Farmers Ins. Co., Inc.*, 23 F. Supp.3d 1342, 1350 (N.D. Okla. 2014) (citing *Carney v. State Farm Mut. Auto. Ins. Co.,* 877 P.2d 1113, 1119 (Okla.1994)). If the insurer unreasonably delays in complying with its contractual duties, the plaintiff may be able to

recover consequential damages, but only upon a successful action sounding in tort. *See Watson*, 23 F. Supp. at 1350–51. This is fatal to Mr. Graves's contract claim.

Even if Mr. Graves were able to prove that Travelers breached its contractual duties, he would not be able to prove damages at trial. It is not disputed that Travelers eventually paid the limits available under the policy's UM coverage. In doing so, it provided Mr. Graves with the money due to him under the contract. Because there is no genuine dispute regarding the question of contractual damages, Travelers is entitled to judgment as a matter of law regarding Mr. Graves's contract claim.

**B.** **Bad Faith**

Under Oklahoma law, an insurer has an implied-in-law duty to act in good faith and deal fairly with its insured to ensure that the policy benefits are received, and a violation of that duty gives rise to an action in tort. *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1123 n.8 (10th Cir. 2012); *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005); *Christian v. Am. Home Assur. Co.*, 577 P.2d 899, 901–05 (Okla. 1978). The elements of a bad faith claim against an insurer for delay in payment of first-party coverage are: (1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury. *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009).

"The essence of the tort of bad faith, as it is recognized in Oklahoma, is the unreasonableness of the insurer's actions." *Timberlake Const. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 343 (10th Cir. 1995) (quoting *Conti v. Republic Underwriters Ins. Co.*, 782 P.2d 1357, 1360 (Okla. 1989)). The decisive question is whether the insurer had a "good faith belief, at the time its performance was requested, that it had justifiable reason for withholding payment under

11

the policy." *Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000) (quoting *Buzzard v. McDanel*, 736 P.2d 157, 159 (Okla. 1987)). "The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim." *Id.*

In this case, Mr. Graves alleges that Travelers unreasonably delayed payment twice. First when it denied that the claim was covered at all, and again when it initially valued his claim at only $850,000, rather than the $1 million he claimed.

### 1. Disclaimer of Coverage

Travelers argues that its initial disclaimer of coverage was reasonable based on the information it had at the time. (*See* Doc. 93 at 17–18). It is undisputed that the policy only covered a leased vehicle if the lease required Hahn to provide primary insurance on the vehicle, and it is also undisputed that the "Certification of Lease" that Hahn provided when it made its physical-damage claim did not include the necessary clause. Consequently, Travelers contends, its disclaimer was "justified and reasonable under the circumstances, as Travelers did not know, and did not have any reason to know at the time[,] that a more comprehensive Penske Lease Agreement existed." (*Id.* at 18).

This argument fails for three reasons. First, there is a genuine factual dispute as to whether Travelers knew, or had reason to know, that that the Certification of Lease did not represent the full lease agreement. Second, Travelers' failure to provide information to Mr. Graves supports an inference that its denial of coverage was unreasonable and in bad faith. Finally, Travelers' duty of good-faith entailed a duty to reasonably investigate Mr. Graves's claim, and the evidence does not show that Travelers satisfied this duty as a matter of law.

#### a. Travelers' Knowledge

The evidence is conflicting as to whether Travelers truly believed that the Certification of Lease was the full lease agreement. Mr. Meyer testified that he "had no reason to believe that [the

12

lease document on file] was incomplete on January 3rd," the day he made his initial decision to deny Mr. Graves's claim, (93-10 at 43), but several pieces of circumstantial evidence suggest otherwise.

For one, the Certification of Lease itself bears many clues that it was not the full lease agreement. The document's title, set out in bold at the very top of the first page, says "Certification of Lease," not "lease agreement," or "contract for lease," or anything else that would suggest it is a lease contract. (*See* Doc. 93-4 at 1). And the four sentences comprising the body of its text include none of the elements one would expect to find in a standard contract. There are no defined terms or recitations, no language allocating risk, and no legal boilerplate of any kind. Even that most basic element necessary to establish any contract—a mutual exchange of promises—is absent. Moreover, the Certification itself refers to the "Vehicle Lease Service Agreement" as a separate document. (*See* Doc. 93-4 at 1, stating that the vehicle will be operated "as set forth in the Vehicle Lease Service Agreement" and that "[m]aster copies of the Vehicle Lease Service Agreement and Addendums thereto are on file in both the home office of the Lessee and the Lessor"). Given these characteristics, a reasonable juror could conclude that a person of Mr. Meyer's knowledge and experience would have recognized that the purpose of the Certification of Lease was to provide evidence that the vehicle was under a long-term lease from Penske, not to provide the terms of the lease agreement itself.

What is more, Mr. Meyer's interactions with Mr. Graves's attorneys were inconsistent with a good-faith belief that the Certification of Lease represented the full agreement. When Mr. Meyer notified Mr. Graves's attorneys of the denial, he made no mention of any deficiency in the "lease agreement" on file. He merely told Mr. Graves's attorney that Hahn's policy only provided UM coverage for owned vehicles and that the vehicle in question was leased. Then, when Mr. Graves's

13

attorney requested the policy so he could see for himself, Mr. Meyer provided the portion of the policy showing UM coverage for "owned autos" but withheld the Lessor Endorsement, which provided that a leased vehicle was "owned" if the lease agreement required Hahn to provide primary insurance. Given the importance of the Lessor Endorsement to the question of coverage, a juror could reasonably infer that these omissions were strategic rather than accidental. Moreover, having drawn such an inference, a juror could also infer that Mr. Meyer would only have reason to obscure the importance of the Lessor Endorsement if he knew, or at least suspected, that the document on file was incomplete and that the full agreement included the necessary language.

Travelers argues that it was reasonable to believe that the Certification of Lease was the full lease agreement because that was the document Ms. Mironava submitted with Hahn's physical damage claim. This is certainly evidence in Travelers' favor, but it falls well short of putting the question of Travelers' knowledge beyond dispute. Moreover, that Travelers accepted the Certification as if it were the full agreement when processing Hahn's claim does not necessarily mean that Travelers truly believed this to be the case. The policy's standard terms provided that any vehicle under a long-term lease qualified as "owned" for the purposes of physical-damage claims. Since the Certification of Lease showed that the truck was under such a lease, that was sufficient to establish coverage as an "owned auto" under "symbol 2." Given the distinctly un-lease-like character of the Certification, a reasonable juror could therefore conclude that Travelers knew the document did not represent the full agreement but treated it as such when processing Hahn's claim because nothing more was required in order to establish physical-damage coverage.

      **b.**    **Denial of Information**

Evidence that Travelers intentionally concealed important policy information is sufficient to preclude summary judgment. The Unfair Claims Settlement Practices Act requires insurers to "fully disclose to first party claimants, benefits, coverages, or other provisions of any insurance

policy or insurance contract when the benefits, coverages or other provisions are pertinent to a claim" and forbids "[k]nowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages at issue." Okla. Stat. tit. 36, § 1250.5. Such conduct may be punished as an "unfair claim settlement practice" when the conduct is "flagrant" or routine "business practice." *See* Okla. Stat. tit. 36, §§ 1250.3, 1250.5.

Although the Act does not provide a private right of action, and a statutory violation does not establish bad faith per se, the statute provides a useful guide when determining whether an insurer's conduct was unreasonable and sufficient to constitute a basis for a bad faith claim. *Beers v. Hillory*, 241 P.3d 285, 294 (Okla. Civ. App. 2010). Because there is evidence that Travelers engaged in exactly the kind of behavior that the statute seeks to punish, the Court concludes that the question of bad faith is one for the jury.

        c.      **Reasonable investigation**

Finally, a genuine belief that the Certification of Lease was the full agreement does not, ipso facto, preclude a finding of bad faith. Bad faith turns not only on what was known to the insurer at the time, but also on what was reasonably knowable. *Buzzard v. McDanel*, 736 P.2d 157, 159 (Okla. 1987); *Watson v. Farmers Ins. Co.*, 23 F. Supp. 3d 1342, 1349 (N.D. Okla. 2014). Accordingly, when presented with a claim by its insured, an insurer "must conduct an investigation reasonably appropriate under the circumstances." *Newport*, 11 P.3d at 195. The Tenth Circuit, interpreting Oklahoma law, has held that an insurer's failure to conduct a reasonable investigation may, in some circumstances, support an inference that the insurer has acted in bad faith, particularly when the manner of investigation suggests that the insurer has constructed a sham defense to the claim or has intentionally disregarded undisputed facts supporting that claim. *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1442 (10th Cir. 1993).

Here, Travelers points to no evidence that it did anything to confirm its understanding of the lease agreement between Hahn and Penske, though it appears that obtaining a true copy would not have been a daunting task. The lease agreement was among the documents that Hahn submitted to HUB so that underwriters, including Travelers' Nick Burke, could bid for Hahn's business. Had Travelers inquired with HUB, it would have discovered that HUB still had the lease on file. Alternatively, Travelers could have contacted Penske directly. The two were already in contact due to Hahn's physical-damage claim. (*See* Doc. 101 at 9, 10). Despite these readily available avenues, Mr. Meyer decided, less than 24 hours after beginning his investigation and based solely on the document already on file, that the lease agreement did not have the required primary-insurance clause. (*See* Doc. 100-1 at 6–7). Given that the Certification of Lease does not at all resemble a lease agreement, a reasonable jury could conclude that, under the circumstances, reasonable investigation required more before denying Mr. Graves's claims.

### 2. Value of Benefits

Mr. Graves claims that, although Travelers ultimately paid his claim in full, it unreasonably delayed in doing so. Travelers counters that its initial payment of $850,000 was reasonable based on the information that it had and that it promptly paid the $150,000 that remained under the policy limits when it received new information.

After conducting a reasonably appropriate investigation, an insurer must promptly settle the claim for the value or within the range of value assigned to the claim as a result of its investigation. *Newport*, 11 P.3d at 196. Failure to do so may subject it to a claim for bad faith from its insured. *Id.* "This is not to say an insurer may not negotiate or litigate the value of the claim. The duty of good faith and fair dealing merely prevents an insurer from offering less than what its own investigation reveals to be the claim's value." *Id.*

Here, it is undisputed that Mr. Graves made a policy limits claim of $1 million on March 27, 2018; that Travelers tendered payment of $850,000 on May 15, 2018; and that Travelers issued a check for $150,000, the remaining amount available under the policy, on July 23, 2018. Travelers asserts in its Statement of Undisputed Facts that its initial payment was "[b]ased on the information gathered by Travelers since March of 2018," (Doc. 93 at 13), and that it decided to tender the remaining $150,000 after learning that SFIC was setting aside an additional $481,399 for future medical and other benefits, (Doc. 93 at 13–14). These assertions are supported by the record.

Mr. Graves makes only a cursory attempt to rebut Travelers' explanation. Although he says "[w]e don't know why Travelers tendered the remainder of the UM policy benefits," he points to no evidence suggesting Travelers' initial payment was unreasonable based on the information it had at the time or that Travelers should have paid his claim in full earlier than it did. (Doc. 100 at 13–14).

Mr. Graves has failed in his burden to come forth with evidence creating a genuine dispute about the reasonableness of Travelers' payments. The undisputed evidence shows that, once Travelers decided to recognize coverage of the claim, it obtained permission to review his medical records and bills. Within two months of his claim, the company tendered 85 percent of the claimed amount. Two months later, after Travelers obtained more information about his prognosis, the company paid his claim in full. Because the only evidence provided to the Court shows that Travelers' payments were in line with the value determined by its investigation, and because that investigation appears to have been appropriate under the circumstances, Travelers' conduct in valuing and paying Mr. Graves's claim was reasonable as a matter of law. Accordingly, Travelers is entitled to summary judgment regarding Mr. Graves's claim that the company acted in bad faith by "low-balling" the value of the benefits he was due under the policy.

### C. Punitive Damages

Travelers argues that, even if the Court permits Mr. Graves's bad-faith claim to move forward, it should grant summary judgment on the issue of punitive damages. In Oklahoma, punitive damages are available "[w]here the jury finds by clear and convincing evidence" that an insurer has recklessly, or intentionally and with malice, "disregarded its duty to deal fairly and act in good faith with its insured." Okla. Stat. tit. 23, § 9.1(B), (C). According to Travelers, the Court should grant summary judgment on the availability of punitive damages because Mr. Graves "cannot meet the higher standard of clear and convincing evidence to support the inference of punitive damages." (Doc. 93 at 23).

Having reviewed the record, the Court finds summary judgment is unwarranted. The determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Accordingly, the Court's inquiry here is whether the evidence presented is such that a jury applying a clear and convincing evidence standard could reasonably find that Travelers acted with the requisite degree of culpability. As explained above, there is strong circumstantial evidence that Travelers knew, or at least suspected, that it was not in possession of the full lease when it told Mr. Graves's counsel that the policy did not cover his UM claim. And there is also evidence that it knew, or at least suspected, that the full lease would show that the vehicle was covered under the policy. The Court therefore finds that, even under a clear and convincing standard, a jury could reasonably find that Travelers acted recklessly or even intentionally and with malice.

### IV. Conclusion

For the reasons explained above, the defendant's motion for summary judgment (Doc. 93) is **granted in part and denied in part.** The Court grants the motion with respect to Mr. Graves's

18

breach of contract claim and the portion of his bad faith claim arising from Travelers' valuation of the benefits due to him. The Court denies the motion with respect to the portion of Mr. Graves's bad faith claim arising from Travelers' initial disclaimer of coverage. The motion is likewise denied regarding the availability of punitive damages.

    SO ORDERED this 1st day of March, 2021.

_____
JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT